# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: July 3, 2025

```
* * * * * * * * * * * * * * * * * * * *
VICTORIA PUSATERI,              *
                               *
              Petitioner,      *        No. 16-467
                               *
v.                             *        Special Master Gowen
                               *
SECRETARY OF HEALTH            *
AND HUMAN SERVICES,            *
                               *
              Respondent.      *
* * * * * * * * * * * * * * * * * * * *
```

*Scott W. Rooney,* Nemes, Rooney P.C., Farmington Hills, MI, for petitioner.
*Catherine E. Stolar,* U.S. Dept. of Justice, Washington, D.C., for respondent.

### DECISION ON FINAL ATTORNEYS' FEES AND COSTS[1]

On October 22, 2024, Victoria Pusateri ("petitioner") filed a motion for final attorneys' fees and costs. Petitioner's Motion for Attorneys' Fees ("Pet'r Fees Mot.") (ECF No. 147). Petitioner is requesting that her attorney, Mr. Scott Rooney, be awarded final attorneys' fees and costs in the total amount of $20,164.24. *Id.* at 2. For the reasons set forth below, I hereby **DENY** petitioner's motion for final attorneys' fees and costs in part and **GRANT** petitioner's motion in part for $2,685.83 in petitioner's costs.

### I.      Procedural History

Petitioner filed her claim in the National Vaccine Injury Compensation Program[2] on April 13, 2016. Petition (ECF No. 1). Petitioner alleged that the human papillomavirus vaccine

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), because this opinion contains a reasoned explanation for the action in this case, I am required to post it on the website of the United States Court of Federal Claims. The court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7. **This means the opinion will be available to anyone with access to the Internet.** Before the opinion is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes  medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). "An objecting party must provide the court with a proposed redacted version of the decision." *Id.* **If neither party files a motion for redaction within 14 days, the opinion will be posted on the court's website without any changes.** *Id.*

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-1 to -34 (2012) ("Vaccine Act" or "the Act"). All citations in this decision to individual sections of the Vaccine Act are to 42 U.S.C.A. § 300aa.

("HPV") she received on April 22, 2013 significantly aggravated her immunodeficiency disorder, inflammatory bowel condition, esophagitis, bronchitis, and alopecia areata. *Id.* The petition was accompanied with medical records. *See* Petitioner's Exhibits ("Pet'r Exs.") 1-10, 12. She filed expert reports from Dr. John Santoro, a gastroenterologist, to support her claim that the HPV vaccine caused her to develop ulcerative colitis and Dr. Marc David Glashofer, to support her claim that petitioner's alopecia was caused by the HPV vaccine. Pet'r Exs. 14, 15.

Respondent filed the Rule 4(c) report recommending against compensation, arguing that petitioner's development of symptoms was "outside the accepted timeframe to demonstrate vaccine causation or significant aggravation," and that petitioner's diagnosis of Common Variable Immune Deficiency ("CVID") provided alternative causes to her condition. Respondent Report ("Resp't Rept.") (ECF No. 64). Respondent also filed an expert report from Dr. Randy Longman, a gastroenterologist, who opined that petitioner's underlying immune deficiency and repeated exposure to antibiotics caused the exacerbation of her gastrointestinal issues. Resp't Ex. A at 5 (ECF No. 63).

The undersigned held a Rule 5 Status Conference on April 25, 2018, when I observed that petitioner had a pre-existing history of alopecia, but that it was possible that the ulcerative colitis may have been caused by an immune reaction to the HPV vaccine. Rule 5 Order at 1-2 (ECF No. 69). I also observed that petitioner had a treating physician from the Children's Hospital of Michigan, indicate that it was a possibility that petitioner had CVID, but thought that petitioner's hypogammaglobulinemia would be reversed once her colitis was under control. *Id.* at 2; *see also* Pet'r Ex. 2 at 67.

After both parties filed supplemental expert reports from the gastroenterologists and petitioner filed updated medical records, I held another Rule 5 status conference. *See* Resp. Ex. G; Pet. Ex. 20. I noted that petitioner's diagnosis appeared to be somewhat less clear, especially as her immune deficiency continued, even after her colitis had resolved. Furthermore, I again noted that some of petitioner's medical records suggest that her alopecia, urticaria, warts, and recurrent sinusitis appeared prior to the vaccinations. Rule 5 Order (ECF No. 94). I posed a series of questions to petitioner's experts in the Order.

Petitioner continued to supplement the record with updated medical records, which included diagnoses from treating physicians. *See* Pet'r Ex. 25. I held another status conference on January 22, 2020, when I reviewed these records with the parties and observed that petitioner's diagnoses included CVID, alopecia areata, inflammatory bowel disease, and others. Scheduling Order (ECF No. 108). Furthermore, petitioner was also diagnosed with "possible WHIM syndrome,"[3] and chronic urticaria and angioedema. *Id.* at 2; *see also* Pet'r Ex. 26 at 2099. During the status conference, petitioner's counsel stated that petitioner was "narrowing" her claim, focusing on a significant aggravation of alopecia. Scheduling Order at 2. I indicated that it would take an additional expert report to "consider how the HPV vaccine stimulated (or significantly aggravated) an autoimmune condition like alopecia if it is clear that petitioner did

---

[3] WHIM syndrome is a congenital immune deficiency with characteristics clinical features that include **W**arts, **H**ypogammaglobulinemia, recurrent bacterial **I**nfections, and **M**yelokathexis (apoptosis of mature myeloid cells in the marrow). Kawai, T. and Malech, H., *WHIM Syndrome: Congenital Immune Deficiency Disease,* 16(1) Curr. Opin. Hematol. 20-26 (2009), doi: https://doi.org/10.1097%2FMOH.0b013e32831ac557.

not mount any immune response to the vaccine, as observed by treating physician, Dr. Savasan. *Id.* The understand stated that the explanations offered by her previous expert, Drs. Santoro and Glashofer, were not supported by the medical records, as petitioner continued to suffer from CVID after her colitis resolved and her alopecia began prior to vaccination. *Id.*

Petitioner filed a supplemental expert report from Alan F. Cutler, M.D., another gastroenterologist. Pet'r Ex. 28 (ECF No. 119). Dr. Cutler indicated that he disagreed that petitioner's CVID was caused by intestinal inflammation, but that petitioner developed gastroparesis because of the HPV vaccine. *Id.* at 1-2. I held another status conference with the parties on July 27, 2021, when I recounted petitioner's extensive medical history and indicated that Dr. Cutler's newest opinion that petitioner developed gastroparesis because of the HPV vaccine had significant problems. I noted there was no evidence that petitioner had gastroparesis and by this time petitioner's diarrhea had resolved and her immunoglobulins remained essentially undetectable. While both Drs. Santoro and Cutler focused on Dr. Marks' early hypothesis that the immune deficiency was caused by her diarrhea, Dr. Marks had appropriately revised her opinion to diagnose petitioner with agamaglobulanemia not caused by diarrhea.

Given the medical records and the somewhat contradictory expert opinions, the undersigned recommended that petitioner voluntarily dismiss her petition, however, if petitioner intended to proceed on this matter, I set a deadline for respondent to file a motion to dismiss. Scheduling Order (ECF No. 123).

Petitioner decided to continue to proceed with her claim. In the interim, petitioner's attorney filed a third motion for interim attorneys' fees and costs. *See* Pet. Mot. for Interim Attorneys' Fees and Costs (ECF No. 126). The undersigned held another status conference on February 11, 2022, when I indicated that "the path to demonstrating entitlement by preponderant evidence seems extremely unlikely in this matter," and the medical records demonstrated that petitioner had no response to the HPV vaccine, or any other vaccines she had received. Scheduling Order (ECF No. 133).

Relevant to this motion, the undersigned informed counsel that petitioner would likely lose reasonable basis if she continued to litigate her claim, given the multiple issues identified in the multiple status conferences and the strong evidence that she had no immune response to the HPV vaccine, much less an autoimmune response due to her underlying diagnosis of CVID. Considerable leeway was granted to the petitioner in this case and I granted petitioner's third motion for interim attorneys' fees and costs and entering a decision awarding petitioner's interim fees and costs on February 16, 2022 in the amount of $54,872, compensating for work done prior to February 2022. *Pusateri v. Sec'y of Health & Hum. Servs.,* No. 16-467, 2022 WL 702245 (Fed. Cl. Spec. Mstr. Feb. 16, 2022). Petitioner had previously been reimbursed for expert costs in the sum of $17,725 in a prior interim fees decision. *Pusateri v. Sec'y of Health & Hum. Servs.,* No. 16-467, 2018 WL 1310483 (Fed. Cl. Spec. Mstr. Mar. 14, 2018).

Petitioner filed a status report on February 17, 2022, stating that she wished to proceed with a motion for a decision on the records. Pet'r Status Report (ECF No. 135). On March 30, 2022, respondent filed a motion for a ruling on the record, requesting that this petition be dismissed. Resp. Motion ("Mot.") (ECF No. 139). Petitioner filed a response to respondent's

motion on August 15, 2022.  Pet. Response to Mot.  (ECF No. 142).  On October 6, 2022, respondent filed a reply to petitioner's response.  Resp. Reply (ECF No. 144).

The undersigned entered a Decision dismissing petitioner's claim on September 23, 2024. *Pusateri v. Sec'y of Health & Hum. Servs.,* No. 16-467, 2024 WL 4534143 (Fed. Cl. Spec. Mstr. Sept. 24, 2024).  On October 22, 2024, petitioner filed this motion, seeking $20,137.50 for attorneys' fees and $26.74 in attorneys' costs.  Pet'r Fees Mot. at ¶ 6.  Additionally, petitioner is seeking reimbursement of $2,685.83 in costs associated with obtaining her medical records.  *Id.* at ¶ 8.  The motion states that "petitioner paid for medical records purchased in this matter while Counsel paid the Court costs."  *Id.* at ¶ 2.  The petitioner having been previously compensated for attorney's fees and costs as late as February 16, 2022 this decision denying additional fees addresses the request for fees generated after the February 11, 2022 status conference.

Respondent filed a response to petitioner's motion stating that "this case lost reasonable basis after the parties' February 7, 2022 status conference and opposes an award for all fees and costs incurred thereafter."  Resp't Response at 1 (ECF No. 151).  Respondent, referring to the Scheduling Order issued after the February 7, 2022 status conference, stated that petitioner lost [her] reasonable basis to proceed….when this Court recommended—for the second time—that petitioner file a motion for voluntary dismissal," and that the order "makes clear that there was no objective ground on which petitioner could proceed with her claim."  *Id.* at 7; citing Scheduling Order (ECF No. 133).  Respondent argued that even by the February 7, 2022 status conference, petitioner had "no scintilla of evidence" to support causation in her case and that after the status conference, petitioner continued to litigate her claim, despite the well-documented "overriding condition, CVID" in her medical records.  Resp't Response at 8. Respondent argued that by pursuing her claim past February 7, 2022, she engaged in frivolous litigation without acknowledging the meritless nature of her claim.  *Id.* at 9.

Petitioner filed a reply on December 18, 2024, stating that motion for final attorneys' fees and costs included a request for petitioner's costs associated with obtaining her medical records that was not previously included in other interim fee requests.  Pet'r Reply at 1 (ECF No. 153). Petitioner stated, "While the substance of the Court's discussion on fees moving forward after the status conference in 2022 dealt with the likelihood [that] fees moving forward might not be awarded, such [discussion] did not deal with the issue of costs for medical records, which are separately sought in the present motion for fees and costs."  *Id.*  Petitioner, therefore, requests that costs should be awarded to the petitioner for obtaining the medical records in this case as the records were ordered during the pendency of the case when the issues of good faith and reasonable basis were not at issue.  *Id.*

This matter is now ripe for adjudication.

## II.    Legal Standard

The Vaccine Act permits an award of "reasonable attorneys' fees" and "other costs."  42 U.S.C. §§ 300aa-15(e)(1).  If a petitioner succeeds on the merits of his or her claim, the special master shall award reasonable attorneys' fees and costs.  However, a petitioner need not prevail on entitlement to receive a fee award as long as "the special master or court determines that the

petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." § 15(e)(1). The Federal Circuit reasoned that in formulating this standard, Congress intended "to ensure that vaccine injury claimants have readily available a competent bar to prosecute their claims." *Cloer v. Sec'y of Health & Human Servs.*, 675 F.3d 1358, 1362 (Fed. Cir. 2012).

"Good faith" and "reasonable basis" are two distinct requirements. *Simmons v Sec'y of Health & Human Servs.*, 875 F.3d 632, 635 (Fed. Cir. 2017) (citing *Chuisano v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 276, 289 (2014)).

Good faith is a subjective inquiry that questions whether petitioner's counsel exercised adept professional judgment in determining whether a petitioner may be entitled to compensation. *Chuisano v. United States*, 116 Fed. Cl. 276, 286 (2014). In the absence of a showing of bad faith, petitioners in the Vaccine Program are "entitled to a presumption of good faith." *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996). Respondent does not challenge that petitioner's claim was brought in good faith. Resp't. Resp. at 7. I do not question that the petition was brought in good faith. Therefore, petitioner's good faith is presumed and requires no further analysis.

Reasonable basis is an objective consideration of the totality of the circumstances except in regard to the statute of limitations or conduct by petitioner's counsel. *Simmons*, 875 F.3d at 635; *Chuisano*, 116 Fed. Cl. at 289. Reasonable basis looks to "the feasibility of the claim" instead of the "likelihood of success." *Chuisano*, 116 Fed. Cl. at 286. The evaluation of the totality of the circumstances may include objective factors such as "the factual basis of the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 289-90 (2018); *see also Scalon v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 629, 633-34 (2014).

Petitioner must furnish some evidence in support of the claim. *Bekiaris v. Sec'y of Health & Human Servs.*, 140 Fed. Cl. 108, 115 (2018). The burden to establish reasonable basis is lower than the preponderance of the evidence standard that is required to recover on the merits of a claim. *Curran v. Sec'y of Health & Human Servs.*, 130 Fed. Cl. 1, 5 (Fed. Cir. 2017); *Chuisano*, 116 Fed. Cl. at 288. Counsel must perform, at a minimum, a simple review of available medical records to satisfy that the claim is feasible. *Silva v. Sec'y of Health & Human Servs.*, 108 Fed. Cl. 401, 405 (2012). Although counsel does not have to resolve all the issues in controversy at the time of filing of the petition, analyzing reasonable basis does not discount the need for evidentiary support of petitioner's claim. *Johnsen v. Sec'y of Health & Human Servs.*, No. 15-1219V, 2018 WL 1833424, at *7 (Fed. Cl. Spec Mstr. Jan. 17, 2018) (citing *Simmons*, 875 F.3d at 636). Should petitioner's counsel realize that a claim cannot be proven, they "have an obligation to voluntarily dismiss a Vaccine Act claim." *Cottingham v. Sec'y of Health & Humans Servs.*, 134 Fed. Cl. 567, 574 (2017) (citing *Perreira v. Sec'y of Health & Human Servs.*, 33 F.3d 1375, 1376 (Fed. Cir. 1994); *Curran v. Sec'y of Health & Human Servs.*, 130 Fed. Cl. 1, 6 (2017); *Allicock v. Sec'y of Health & Human Servs.*, 128 Fed. Cl. 724, 727 (2016)).

The evidentiary standard for establishing a reasonable basis as prerequisite to an award of attorneys' fees and costs is lower than the evidentiary standard for being awarded compensation under the Vaccine Act. To establish a reasonable basis for attorneys' fees, the petitioner need not

prove a likelihood of success. *See Woods v. Sec'y of Health & Human Servs.*, No. 10-377V, 2012 WL 4010485, at \*6-7 (Fed. Cl. Spec. Mstr. Aug. 23, 2012). Instead, the special master considers the totality of the circumstances and evaluates objective evidence that, while amounting to less than a preponderance of evidence, constitutes "more than a mere scintilla" of evidence. *Cottingham v. Sec'y of Health & Human Servs.*, 971 F.3d 1337, 1344, 1346 (Fed. Cir. 2020); *see also Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 287 (Fed. Cl. 2018).

Determining what constitutes "more than a mere scintilla" of evidence has been acknowledged to be a "daunting task." *Cottingham v. Sec'y of Health & Human Servs*., 154 Fed Cl. 790, 795 (2021). The required showing has been characterized as "evidence beyond speculation that provides a sufficient basis for a reasonable inference of causation." *Id*. (quoting *Penley v. McDowell Cnty, Bd. Of Educ*., 876 F.3d 646, 655 (4th Cir. 2017).) "More than a mere scintilla" of objective evidence supporting causation can derive from medical records that provide "only circumstantial evidence of causation." *James-Cornelius*, 984 F.3d at 1379-80.

The Federal Circuit has confirmed that a case can lose its reasonable basis as it proceeds. *Perreira,* 33 F.3d at 1376-77.  Counsel has a duty to avoid frivolous litigation and should use "reasoned judgment in determining whether to….pursue a claim." *Murphy v. Sec'y of Health & Human Servs.,* 30 Fed. CL. 60, 62 (1993), *aff'd* 48 F.3d 1236 (Fed. Cir. 1995).  "[T]he [Vaccine] Program's interest in promoting representation in vaccine cases, as contemplated by the attorneys' fees provisions of the statute must be balanced carefully against the court's examination of the reasonableness of the basis for bringing the vaccine petition." *Turner v. Sec'y of Health & Human Servs.,* No. 99-544V, 2007 WL 4410030, at \*11 (Fed. Cl. Spec. Mstr. Nov. 30, 2007).  Although counsel has an "ethical obligation to be a zealous advocate," that does not give counsel a "blank check to incur expenses without regard to the merits of the claim." *Perreira,* 27 Fed. Cl. 29, 34-35 (1992).

### III.    Objective Evidence

#### a.  Petitioner's Medical Records

Petitioner's medical records are summarized in great detail in the Decision dismissing her petition.  *See Pusateri v. Sec'y of Health & Hum. Servs.,* 2024 WL 4534143, at \*4-12.  I adopt the summary of petitioner's medical records and expert reports detailed therein and highlight the most relevant objective evidence to the issue of reasonable basis for attorneys' fees.

Prior to petitioner receiving the HPV vaccine on April 22, 2013, petitioner had a medical history that included repeated hives, sinus infections, hair loss in her eye lashes.  *See generally* Pet'r Exs. 2, 9.  In 2011, two years prior to receiving the HPV vaccines, petitioner had repeatedly been treated for sinus infections with antibiotics and prednisone.  Pet'r Ex. 9 at 1.  Petitioner had also sought treatment for hives on April 12, 2011, April 25, 2011, May 11, 2011, May 31, 2011, and June 28, 2011.  Pet'r Ex. 9 at 1 (diagnosed with recurrent urticaria and given a course of prednisone and an antihistamine); Pet'r Ex. 2 at 87 (Zyrtec did not significantly improve the occurrence of hives and she was experiencing them intermittently).

In the months prior to receiving the vaccination at issue, petitioner was diagnosed with sinusitis on January 9, 2013 and given a course of antibiotics and a nebulizer, but at the follow-up appointment on January 30, 2013, petitioner's cough and congestion had continued and she was prescribed another course of amoxicillin.  Pet'r Ex. 9 at 6.  Petitioner followed up on February 18, 2013 and presented with a hoarse voice, neck feeling swollen, and congestion.  *Id.* at 6.  The medical record indicates that petitioner had finished a Z-pack.  *Id.*  At this appointment petitioner received her first HPV vaccination.  *Id.*  On April 20, 2013, petitioner returned to her primary care physician for a runny nose, coughing, and green discharge that had been occurring for five days.  *Id.* at 7.  Petitioner's hives also had reappeared.  *Id.* Petitioner was prescribed prednisone, an antibiotic, and Zyrtec-D.  *Id.*  Two days later, on April 22, 2013, petitioner received the second HPV vaccine.  *Id.*

Seven days after her second HPV vaccination, on April 29, 2013, petitioner returned to her primary care physician for a follow-up of her sinus infection.  Pet'r Ex. 2 at 3.  Petitioner had finished her antibiotic course; however, her hives were now all over her body.  *Id.* Petitioner indicated that the hives were coming and going.  *Id.*  Petitioner also reported that the cough and congestion was a little better while on the antibiotics, but they came back.  *Id.*  Claritin and Zyrtec were not helpful in controlling the hives either.  *Id.*  She was prescribed a fourteen-day course of Augmentin, another antibiotic.  *Id.*

Petitioner returned to her pediatrician on May 1, 2013 for a follow-up and she indicated that her hives were improving on the prednisone. Pet'r Ex. 2 at 4.  Her physician wrote that she was "unable to determine a cause of hives since she had been having recurring hives prior to getting both antibiotics."  *Id.* at 4.

On June 12, 2013, petitioner had an appointment with her primary care physician for coughing, hives (for three months), eye lashes and eyebrows falling out for two months, and diarrhea for one week.  Pet'r Ex. 2 at 4.  It was noted that petitioner had recurrent hives and that she had an allergy evaluation, and the cause of the hives was undetermined.  *Id.* Petitioner was referred to an allergist for another evaluation and diagnosed with recurrent urticaria.  *Id.*  Two weeks later, petitioner reported that she was still having diarrhea twice a day, her left ear was plugged and she still had hives.  *Id.*

On June 28, 2013, petitioner had a follow-up appointment with her dermatologist for the plantar warts.  Pet'r Ex. 4 at 5.  There was a note indicating that petitioner had concerns about her eyelashes and eyebrows falling out for three months.  *Id.*  Petitioner also reported that she had diarrhea for three weeks and a history of ulcerative colitis.  Petitioner was diagnosed with urticaria and alopecia eyebrow.  *Id.*

Petitioner had a consultation at the Gastroenterology, Hepatology, and Nutrition Clinic at Children's Hospital of Michigan on July 10, 2013.  Pet'r Ex. 12A at 22.  Petitioner reported that she was having diarrhea for four weeks, up to six times a day, but decreased.  *Id.* Petitioner also reported abdominal pain, but the pain resolves once she has a bowel movement.  *Id.*  As part of her medical history, it was noted that petitioner had chronic urticaria and she had been hospitalized for vomiting when she was five.  *Id.*  The plan was for comprehensive blood work

and an upper endoscopy and colonoscopy. *Id.* at 24. The blood work revealed that petitioner had extremely low levels of IgA and IgE. *Id.* at 32.

On August 5, 2013, petitioner had an appointment with immunologist, Dr. Amy Marks in the Department of Allergy, Immunology and Rheumatology at the Children's Hospital of Michigan. Pet'r Ex. 2 at 65. Dr. Marks wrote that petitioner was being seen for hypogammaglobulinemia.[4] *Id.* Petitioner reported that her hives began two years prior, and they are chronic but sporadic. *Id.* Petitioner indicated that she was able to treat them with oral antihistamines, but approximately six to eight months ago, the hives worsened. *Id.* at 66. Additionally, petitioner reported a nine-week history of diarrhea. *Id.* Dr. Marks wrote that petitioner had levels of IgA, IgE, IgG, and IgM that were "significantly low." *Id.* Dr. Marks diagnosed petitioner with chronic urticaria, colitis, likely Crohn's disease, hypogammaglobulinemia and truncal esophagitis. *Id.* at 67.

Initially, Dr. Marks hypothesized that petitioner's hypogammaglobulinemia was likely secondary to her diarrhea and colitis. Pet'r Ex. 2 at 67. Because petitioner was being treated with steroids and Asacol, she wanted to retest her immune globulins to see if there was improvement. *Id.* Dr. Marks also wrote that another possibility and cause is CVID, but wrote, "However, at this time, I do believe this is a secondary hypogammaglobulinemia that can be reversed once her colitis is under better control." *Id.* Additionally, Dr. Marks also considered whether petitioner's chronic urticaria could "correlate with an autoimmune disease, like Crohn's," and that petitioner, "likely has autoimmune urticaria." *Id.* at 68. She asked to see petitioner in October. *Id.*

Petitioner had a follow-up with Dr. Marks on September 25, 2013. Pet'r Ex. at 55. Petitioner's follow-up blood work once again showed no immunoglobulins, including IgG, IgA and IgM. Pet'r Ex. 2 at 55. Petitioner reported that her diarrhea had subsided, but she was beginning to show signs of sinusitis. *Id.* During this visit, petitioner reported to Dr. Marks that she was experiencing "quite severe plantar warts on her right foot, involving four of the five toes," and that she was experiencing flat warts on her face. *Id.* Dr. Marks wrote, "Again, when looking back, the warts also started approximately two years ago, which is when [petitioner] started becoming sick quite regularly with sinus infections, per Mom." *Id.* Dr. Marks recommended that petitioner continue a steroid taper, with her last dose being October 4th. At this appointment, Dr. Marks wrote, "Given this constellation of symptoms, with complete agammaglobulinemia, recurrent infections, and warts, I do have some concerns for WHIM syndrome; however, she does not have the typical variants with abnormalities on CBC and neutropenia that can be seen." *Id.* at 56. Dr. Marks stated that it was "imperative" that petitioner begin IVIG, given the recurrent infections and constellation of findings. *Id.* Dr. Marks opined that petitioner either had "atypical agammaglobulinemia or WHIM syndrome variant." *Id.* Petitioner began receiving IVIG infusions on a monthly basis. *See* Pet 'rEx. 17 at 33; Pet'r Ex. 5 at 2; Pet'r Ex. 26 at 2093.

---

[4] Hypogammaglobulinemia is abnormally low levels of all classes of immunoglobulins in the blood. *Hyopogammaglobulinemia,* Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=24235&searchterm=hypogammaglobulinemia (lasted visited Sept. 22, 2024).

Petitioner was evaluated by Dr. Sureyya Savasan, a hematologist in the Department of Hematology and Oncology at the Children's Hospital of Michigan, on December 5, 2013.  Pet'r Ex. 2 at 43.  The purpose of the appointment with Dr. Savasan was to evaluate "possible hematological manifestations of the immunodeficiency disorder she has."  *Id.*  The history of petitioner's clinical course provided in the letter from Dr. Savasan to Dr. Marks is a concise timeline detailing petitioner's various symptoms and issues relevant to her claim.  It provides:

> [Petitioner] had initially presented to the Gastroenterology Clinic in July 2013 with a four to six week history of diarrhea associated with about a 12 lb. weight loss in four weeks. She underwent a colonoscopy and esophagoscopy by the GI Service and was found to have findings suggestive of inflammatory bowel disease and esophageal candidiasis….During routine evaluation in August 2013, she was found to have very low immunoglobulin levels and as a result she was referred to your clinic for evaluation of immune deficiency disorder.
>
> Of note, the patient has a history of chronic urticaria which started about two years ago. The hives appear mostly on the arms, thighs, and trunk.  They are episodic in nature associated with itching.  [Petitioner] required Benadryl over a prolonged period of time for these symptoms.
>
> The patient was noted to have plantar warts involving mainly the inner surface of the toes on the right side for the last two years.  The patient also had a few warts on the face which currently have subsided….Recently the patient was started on every four week IVIG infusions for her hypogammaglobulinemia….[Petitioner] reports that she noted improvement in the warts after she was started on IVIG infusions. [Petitioner] also noticed hair loss about one year ago.  The hair loss mainly involves her scalp hair, eyelashes, and skin on the upper extremities.

*Id.* at 43-44.  Additionally, the same record from Dr. Savasan states:

> IMMUNIZATION STATUS: [Petitioner] has received all of her immunizations, receiving two of the three doses of Gardasil; however, [petitioner] has not mounted an immune response to the vaccines.

*Id.* at 44.  Dr. Savasan reviewed petitioner's past blood work and wrote, "On review of her past labs, [petitioner] had almost undetectable levels of immunoglobulins including IgG, IgA, IgM, and IgE." *Id.* at 47.  Dr. Savasan opined, "Based on the history, physical examination, and laboratory findings, the patient appears to have an immune deficiency/autoimmune condition.  A potential diagnosis of atypical WHIM has been entertained by Immunology, however, the patient does not have neutropenia, the most common sign of the syndrome." *Id.*

Petitioner returned to Dr. Marks on January 6, 2014 for a re-evaluation of her hypogammaglobulinemia.  Pet'r Ex. 2 at 39.  It was at this appointment that Dr. Marks wrote, "Hematology/Oncology ordered many antibody tests.  However, given [petitioner's] agammaglobulinemia *she will not have production of antibodies, so these tests will likely not be significant in terms of her immunologic case." Id.* at 41 (emphasis added).

When petitioner was evaluated by Dr. Joan Tamburro on July 23, 2014, Dr. Tamburro noted that petitioner had been receiving monthly IVIG infusions since August 2013 for agammaglobulinemia.  Pet'r Ex. 5 at 3.  Dr. Tamburro also wrote that the onset of petitioner's hair loss began in her eyelashes, which began prior to the either the diarrhea or agammaglobulinemia diagnosis.  *Id.*  Dr. Tamburro diagnosed petitioner with alopecia areata, verruca plana, verruca vulgaris and opined that it was "likely related to agammaglobulinemia or other immune differential."  *Id.*  Petitioner returned to Dr. Tamburro on September 22, 2014 for a re-evaluation of her alopecia.  *Id.* at 10.  He noted that petitioner had chronic urticaria, recalcitrant flat warts and verrucae, a history of colitis, and an immunodeficiency diagnosed one year ago with a suspicion for WHIM syndrome.  *Id.*  At this appointment, apparently the issue whether the HPV vaccine could have caused petitioner's alopecia was discussed and Dr. Tamburro wrote, "Alopecia areata can be triggered by vaccines (such as Gardasil), *but usually would occur in closer proximity to the vaccination* [than] [petitioner's] alopecia."  *Id.* at 11.

Between 2014 and 2017 petitioner continued to receive IVIG infusions for her agammaglobulinemia and continued treatment for her alopecia and viral warts.  She continued to be treated by Dr. Amy Marks for her primary immunodeficiency condition.  *See generally* Pet'r Ex. 17.

Eventually, petitioner sought a second opinion about her condition and on May 31, 2019, had an appointment with immunologist-allergist physician, Dr. Carl Lauter.  Pet'r Ex. 25 at 21.  Petitioner reported to Dr. Lauter that prior to 2013 she was in good health except for "the occasional upper respiratory infection," and a wart removed from her foot.  *Id.*  Additionally, she reported that she had hives that began five years prior to 2013, which she attributed to heat and sweating.  *Id.*  Petitioner reported that she received her first HPV vaccine in February 2013.  Then in April 2013, she began to have upper respiratory symptoms and hives when she received her second HPV vaccination.  *Id.*  Petitioner reported that three days after the second HPV vaccine, she developed bronchitis, rhinitis, sinusitis, and swollen fingers.  *Id.*  Petitioner also told Dr. Lauter that she declined to get the third HPV dose "due to her 'reactions.'"  *Id.*  After a review of her familial history and physical examination, Dr. Lauter diagnosed petitioner with "agammaglobulinemia, CVID, combined immunity deficiency, viral warts, recurrent sinusitis, alopecia areata," among others.  *Id.* at 26.  Dr. Lauter concurred with her current treatment of monthly IVIG doses, he agreed with her current alopecia management, and he agreed with Dr. Mark's suggestion that she seek genetic testing at a major academic hospital or NIH.  *Id.*

The remainder of her records focused on her treatment for alopecia and intermittent gastrointestinal issues.  *See* Pet'r Ex. 22.  The last medical records filed also indicated that petitioner was still receiving monthly IVIG infusions.  *See* Pet'r Ex. 27.

### b.  Expert Opinions and Medical Articles

To support her claim that the HPV vaccine caused petitioner's underlying conditions to become significantly aggravated, she filed expert reports from Dr. John Santoro, Dr. Marc Glashoffer, and Dr. Alan Cutler.  Pet'r Exs. 14, 15, 20, & 28.  As explained in the Dismissal Decision, the initial expert reports failed to take into consideration some of petitioner's key

10

medical records, including the fact that petitioner's medical providers noted that petitioner had no immune response to any vaccine, including the HPV vaccination, and that many of the conditions petitioner was alleging were caused by the vaccine pre-dated her April 22, 2013 HPV vaccination. *See e.g.* Pet'r Ex. 13 at 8-9 ("Within two months of her vaccination with Gardasil this patient developed a systemic reaction with generalized urticaria, bronchitis, and rhinitis….Within one month of the vaccines the patient developed diarrhea."); Pet'r Ex. 15 at 3 (opining that HPV "set off a reaction of inducing various disease states of autoimmunity in the Petitioner" through a mechanism of molecular mimicry).

After the Court told petitioner's counsel to have the experts address some of the underlying issues in this case, specifically petitioner's diagnosis of CVID and the low immunoglobulin levels, petitioner's experts again did not take into consideration the medical records that contradicted their opinion. For example, in Dr. Santoro's supplemental report, he opined that petitioner's hypogammaglobulinemia was caused by her ulcerative colitis and not petitioner's underlying CVID. Pet'r Ex. 20 at 4. While petitioner's treating physician, Dr. Marks did initially opine that her agammaglobulinemia could be caused by ulcerative colitis, it became evident that petitioner's agammaglobulinemia continued after her diarrhea resolved, leading to a diagnosis of CVID. *See* Pet'r Ex. 12A at 472-73 ("This is a 16-year-old with primary immune deficiency, recurrent infection, and agammaglobulinemia….Again, she does have agammaglobulinemia with a history of recurrent infection….I went through again at length with her the IVIG, and this will likely be life-long for [petitioner].").

In the last expert report petitioner submitted, by Dr. Cutler, he opined that petitioner had gastroparesis, a diagnosis not supported in the medical records and contradictory to diagnoses of diarrhea, ulcerative colitis/inflammatory bowel disease. Additionally, he wrote that there was no other medical condition that could have caused petitioner's issues and wrote that she had developed "a systemic inflammatory reaction" after the HPV vaccination. Pet'r Ex. 28. Again, this expert report did not address petitioner's underlying disease of CVID or explain how the vaccine could cause an autoimmune disease in a person who did not generate an immune response to the vaccine at all.

Respondent's expert, Dr. Longman, a gastroenterologist, also provided a logical explanation of her persistent diarrhea in that it was caused by her long-standing treatment with antibiotics to counter her numerous infections secondary to her lack of immune response. *See* Resp't Ex. A.

## IV.    Analysis and Conclusion of Reasonable Basis for Final Attorneys' Fees and Costs

Initially, when petitioner filed her claim there was some objective evidence that could support reasonable basis, however, after February 7, 2022, petitioner lost reasonable basis. At the outset of her claim, petitioner was alleging that a covered vaccine, the HPV vaccine, significantly aggravated her pre-existing urticaria and hives, and caused her to develop inflammatory bowel conditions. Petition (ECF No. 1). The objective medical records also demonstrated that petitioner's condition before and after the April 22, 2013 vaccination did change, providing factual basis for her significant aggravation claim.

However, as the claim proceeded and petitioner filed expert reports that were contradictory to the medical records and provided opinions unsupported in the medical literature given the petitioner's conditions, reasonable basis began to dissipate, and finally ended on February 7, 2022. After several status conferences with petitioner's counsel during which the undersigned analyzed both the factual record and the expert opinions, it became clear that petitioner's claim was no longer supported by either objective evidence or expert opinion evidence. By February 7, 2022, it was not just evident that petitioner's claim was not going to be successful, but that the objective evidence, especially the medical records, were unable to demonstrate a scintilla of evidence that the HPV vaccine was the cause of her conditions. Instead, the evidence continued to demonstrate that petitioner's underlying conditions pre-dated the vaccinations, her diagnosis of CVID was maintained and likely was the cause of her pre-existing conditions, and that there was no additional support to show how the vaccine could cause the immune reaction postulated by the three experts. At the February 7, 2022 status conference, as had been done in the prior one, the undersigned thoroughly reviewed the medical records and advised petitioner's counsel that there is no long objective evidence to support the allegations in the petition, and continuing to pursue the claim would result in a loss of reasonable basis. Thus, petitioner lost reasonable basis after February 7, 2022. *See Chuisano v. Sec'y of Health & Hum. Servs.,* 116 Fed. Cl. 276, 288-89 (Fed. Cl. 2014) ("Although a claim may have had a reasonable basis at the time of its filing, reasonableness may later come into question if new evidence becomes available or the lack of supporting evidence becomes apparent.").

Finally, in petitioner's reply, addressing only the costs for medical records which had inadvertently not been previously requested, she does not address respondent's argument that reasonable basis for attorneys' fees and costs was lost. Instead, the reply simply requests that petitioner be reimbursed for her costs associated with obtaining all of the medical records filed in her claim. That claim will be addressed below.

As such, I find that petitioner lost reasonable basis for final attorneys' fees and costs on February 7, 2022, and petitioner's motion for final attorneys' fees and costs is therefore **DENIED.**

### V.    Petitioner's Costs

Like attorneys' fees, costs incurred-by counsel or petitioners themselves-must be reasonable to be reimbursed by the Program. *Perreira*, 27 Fed. Cl. Ct. 29, 34. Petitioner requested a total of $2,685.83 in costs associated with obtaining her medical records. In her motion for final attorneys' fees and costs, petitioner states that she paid for the medical records purchased for this claim. These costs are also documented in her motion. These records were acquired prior to the time I advised the petitioner that reasonable basis had been lost. Accordingly, I grant petitioner's motion for final costs and award petitioner $2,685.83 in costs.

> **The petitioner is awarded final costs in the total amount of $2,685.83, to be paid through an ACH deposit to petitioner's counsel, Mr. Scott W. Rooney's IOLTA account for prompt disbursement to the petitioner.**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court shall enter judgment in accordance herewith.[5]

**IT IS SO ORDERED.**

**s/Thomas L. Gowen**
Thomas L. Gowen
Special Master

---

[5] Entry of judgment can be expedited by each party's filing of a notice renouncing the right to seek review. Vaccine Rule 11(a).